# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CORY JUAN BRADEN, JR.,
Defendant and Appellant.

S268925

Fourth Appellate District, Division Two
E073204

San Bernardino County Superior Court
FVI18001116

---

June 5, 2023

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Kruger, Groban, and Jenkins concurred.

Justice Evans filed a dissenting opinion, in which Justice Liu concurred.

---

PEOPLE v. BRADEN

S268925

Opinion of the Court by Corrigan, J.

Penal Code[1] section 1001.36 authorizes pretrial diversion for defendants with qualifying mental disorders. Here we consider the latest point in the criminal proceedings at which a defendant may request such diversion. We conclude that, in keeping with the statutory language and overall scheme, the request must be made before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first. Accordingly, we affirm the judgment of the Court of Appeal, which upheld the trial court's denial of defendant's request for diversion made for the first time after the jury returned its verdict.

## I. BACKGROUND

On April 25, 2018, defendant Cory Juan Braden, Jr., then 38 years old, had a confrontation with his sister. When their mother intervened, Braden kicked her in the groin and choked her, prompting his sister to call 911. A uniformed sheriff's deputy responded. He had been told by dispatch that Braden was schizophrenic with a history of violence. The deputy identified himself to Braden and asked him to submit to a pat-down search to ensure everyone's safety. Braden initially complied, but then turned and punched the deputy in the face.

---

[1] All further undesignated statutory references are to the Penal Code.

The deputy backed up, and Braden advanced with fists clenched. After the two men exchanged punches, the deputy tackled Braden, knocking him to the ground and punching him twice on the left side. Braden continued to resist until two additional deputies arrived and the three officers were able to restrain him. Braden's mother later confirmed that he had "charged" at the first responding deputy.

Braden was charged with resisting an executive officer with force or violence (§ 69) and having two prior qualifying felony convictions under the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).[2] Following a trial at which Braden represented himself, a jury found him guilty and found the prior conviction allegations true.[3] Before sentencing, Braden requested and received appointed counsel, who moved to have Braden considered for mental health diversion under section 1001.36. The People opposed the motion, and the trial court denied it, finding the motion both untimely and moot. The court stated that it would "deny [the motion] in any event

---

[2] Those convictions were assault with a firearm (§ 245, subd. (a)(2)) and discharging a firearm in a grossly negligent manner (§ 246.3). Both offenses occurred on the same date in 2006.

[3] Braden was granted pro se status approximately a week after arraignment. Before trial, he filed several written motions with supporting authority, including a motion to dismiss for outrageous police misconduct, a *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531), a motion for pretrial discovery and disclosure of *Brady* materials (*Brady v. Maryland* (1963) 373 U.S. 83), a motion to reduce the charge to a misdemeanor, and a motion for sanctions for failure to preserve evidence.

because it would still be discretionary." The court sentenced defendant to four years in state prison.

The appellate court affirmed, holding that Braden was ineligible for pretrial diversion because his request was not made before trial began. (*People v. Braden* (2021) 63 Cal.App.5th 330, 332, 342 (*Braden*).) It considered the statute's repeated use of the words " 'pretrial' diversion" (*id*. at p. 333), the requirement that a defendant waive speedy trial rights (*id*. at pp. 334–335), and the nature of various other pretrial diversion programs, "which long have had a purpose of reducing the systemic burdens of criminal trials" (*id*. at p. 335). In so concluding, the court expressly disagreed with *People v. Curry* (2021) 62 Cal.App.5th 314, review granted July 14, 2021, S267394 (*Curry*). (See *Braden*, at pp. 340–342.) *Curry* held that "a defendant may ask the trial court for mental health diversion until sentencing and entry of judgment." (*Curry*, at p. 325.) A third appellate court subsequently held that a defendant may request pretrial diversion up until the verdicts are returned or the defendant enters a plea of guilty or no contest. (*People v. Graham* (2021) 64 Cal.App.5th 827, 833–835, review granted Sept. 1, 2021, S269509 (*Graham*).)

We granted review to resolve the conflict in the Courts of Appeal.

## II. DISCUSSION

Enacted in 2018, section 1001.36 authorizes pretrial diversion for defendants with qualifying mental disorders.

3

(Stats. 2018, ch. 34, § 24; see § 1001.36, subd. (b)(1).)[4] The question here turns on the statute's definition of " 'Pretrial diversion,' " and specifically the phrase "until adjudication." (§ 1001.36, subd. (f)(1), hereafter 1001.36(f)(1).) The statute provides: "As used in this chapter . . . 'Pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," subject to specified conditions. (*Ibid.*)

We have once before considered the import of this language, in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), but our decision in *Frahs* does not answer the question now before us. The question in *Frahs* was whether section 1001.36 applies retroactively to cases in which the judgment was not yet final on appeal when the statute went into effect. Our inquiry was governed by the rule in *In re Estrada* (1965) 63 Cal.2d 740, which "rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*People v. Conley* (2016) 63 Cal.4th 646, 657 (*Conley*).) We held the Legislature did not clearly indicate a contrary intent as to retroactivity. As a result, those defendants whose cases were not final on appeal,

---

[4] Effective January 1, 2023, section 1001.36 was amended in various particulars, including relettering and renumbering of certain subdivisions and subparagraphs. (Stats. 2022, ch. 735, § 1.) We refer to the statute by its current designations.

and who had no opportunity to request diversion in the trial court, should be permitted to do so. (*Frahs*, at pp. 624, 628–637.)

In so concluding, we made some observations about the normal order of proceedings in the trial court: "[W]e view the definition of 'pretrial diversion' as simply reflecting the Legislature's intent regarding how the statute will generally operate when a case comes before the trial court after section 1001.36's enactment. In the ordinary course of procedure, a trial court determines whether a defendant is eligible for pretrial diversion before judgment is entered, and the defendant cannot be heard to seek such diversion afterward. Broadly consistent with this common feature of pretrial diversion, the statute before us provides that diversion is available 'until adjudication' (§ 1001.36, [former subd.] (c)), which the People construe as until the charge or charges against a defendant are resolved. But that expectation regarding how the statute normally will apply going forward is quite different from the specific retroactivity question presented here, to which the *Estrada* inference applies." (*Frahs*, *supra*, 9 Cal.5th at pp. 632–633, fn. omitted.) We also rejected the People's argument that allowing for retroactivity would impermissibly undermine the jury's verdict, noting that such an outcome "would not provide a clear indication that the statute was not intended to apply retroactively. The Legislature could well have intended to allow judges to decide under the statute whether a defendant's mental disorder was a 'significant factor in the commission of the charged offense' [citation] even after a verdict in which a mental health defense had been presented but rejected by the trier of fact." (*Id*. at p. 636.) The question of that intent, which *Frahs* did not decide, is squarely at issue here.

In making its observations, *Frahs* made explicit that it was only evaluating the Legislature's intent in the limited

5

context of the *Estrada* retroactivity inquiry. Unless it has included an express savings clause, the Legislature must demonstrate its intent to limit the retroactive effect of an ameliorative change " 'with sufficient clarity that a reviewing court can discern and effectuate it.' " (*Conley*, *supra*, 63 Cal.4th at p. 657.) Accordingly, the question before us in *Frahs* "boil[ed] down to whether the Legislature 'clearly signal[ed] its intent' to overcome the *Estrada* inference that section 1001.36 applies retroactively to all cases not yet final on appeal." (*Frahs*, *supra*, 9 Cal.5th at pp. 631–632.) This inquiry is "quite different" from how the "statute normally will apply going forward" as to defendants who had the opportunity to seek pretrial diversion during the course of their criminal cases. (*Id.* at p. 633; accord, *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1119 [under *Estrada*, the court must "employ[] a different lens on legislative intent"].) Recognizing this distinction, *Frahs* expressly left open the precise meaning of the phrase " 'until adjudication,' " noting that "we have no occasion here to precisely define" that term, and "our analysis should not be read as tacitly adopting the People's interpretation of this language." (*Frahs*, at p. 633 & fn. 3.)

Relying primarily on the *Frahs* discussion of legislative intent, our dissenting colleagues argue that today's decision marks a "retreat" from *Frahs*'s recognition that the purpose of section 1001.36 was to " ' "[i]ncrease[] *diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system." ' " (Dis. opn. of Evans, J., *post*, at p. 2, quoting *Frahs*, *supra*, 9 Cal.5th at p. 632.) The dissent also cites the observation that the definition of pretrial diversion "simply reflect[s] the Legislature's intent regarding how the statute will *generally* operate when a case comes before

the trial court after section 1001.36's enactment" (*Frahs*, at p. 632, italics added), to argue that the statute's reference to "pretrial diversion" is simply shorthand and not meant to establish a timeline for diversion requests. (Dis. opn. of Evans, J., *post*, at pp. 6, 9.) But the dissent applies too broadly the narrow focus of the *Estrada* retroactivity analysis. As explained above, *Frahs* addressed those defendants whose cases were disposed of before section 1001.36 went into effect. In that context it considered only whether the Legislature intended defendants, who had not had the opportunity to request mental health diversion in the trial court before the enactment, should be allowed to do so retroactively in cases pending on appeal. We concluded that the "breadth of the statute's statement of purpose . . . is consistent with the *retroactive application* of the diversion scheme" and " 'support[s] the conclusion that the *Estrada inference of retroactivity* is not rebutted' — that is, that the Legislature intended to apply the provisions of section 1001.36 [retroactively] to every case to which it constitutionally could apply." (*Frahs*, at p. 632, italics added.) Further, we rejected the People's argument that the phrase " 'until adjudication' expressly *limits retroactive application* of the statute to defendants whose cases had not yet been, in the People's words, 'resolved by a trier of fact.' " (*Ibid.*, italics added.) In doing so, we explicitly declined to determine whether the phrase "until adjudication" meant pretrial, during trial, or until sentencing for cases that come before the trial court after section 1001.36's enactment. (*Frahs*, at pp. 632–633 & fn. 3.) Because *Frahs* did not resolve that separate question, we turn to it here. We are not now speaking of *Estrada* retroactivity, but considering how the new statute, that was in effect before Braden's trial, applies to his case.

" ' " 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' [Citation.] The interpretation of a statute presents a question of law that this court reviews de novo." (*Smith v. LoanMe, Inc*. (2021) 11 Cal.5th 183, 190.)

*A. Statutory Language and Framework*

As noted, the statute defines " 'Pretrial diversion' " as "postponement of prosecution . . . at any point in the judicial process from the point at which the accused is charged until adjudication . . . ." (§ 1001.36(f)(1).) The statute does not separately define "adjudication." The basic legal definition of that word refers to either (1) "[t]he legal process of resolving a dispute; the process of judicially deciding a case" or (2) the "judgment." (Black's Law Dict. (11th ed. 2019) p. 52, col. 1; see *Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1158–1159 (*Busker*) [considering dictionary definitions as an aid to

statutory interpretation].) Accordingly, "adjudication" can mean (1) the process of resolving the criminal charges by trial or entry of plea or (2) the conclusion of all trial proceedings by an entry of judgment. The holdings of the appellate courts reflect this variance. The court below held that the defendant must request pretrial diversion either before trial begins or the defendant pleads guilty or no contest. (*Braden, supra*, 63 Cal.App.5th at pp. 332–333, 337, 342; accord, *People v. Torres* (2019) 39 Cal.App.5th 849, 855.) *Graham, supra*, 64 Cal.App.5th 827, held that the defendant may request pretrial diversion up until the verdicts are returned or the defendant enters a plea of guilty or no contest. (*Id.* at pp. 833–835; accord *People v. Rodriguez* (2021) 68 Cal.App.5th 584, 590–591, review granted Nov. 10, 2021, S270895.)[5] And *Curry, supra*, 62 Cal.App.5th 314, held that the defendant may request pretrial diversion up until sentence is pronounced. (*Id.* at pp. 321–326.) While the phrase "until adjudication," standing alone, is susceptible to more than one meaning, our task here is to construe it in the context of the legislative scheme as a whole.

Turning to the text of section 1001.36, several aspects of the statute's language and its framework support the conclusion that, to be timely, a request for pretrial diversion must be made before *the process* of adjudicating the charges begins, i.e., before jeopardy attaches at trial or the defendant enters a plea of guilty or no contest, whichever occurs first.

---

[5] Like the Courts of Appeal (*Graham, supra*, 64 Cal.App.5th at p. 833; *Braden, supra*, 63 Cal.App.5th at p. 337), we see no distinction in this context between " 'adjudication of guilt based on a plea of guilt and [an adjudication by] trial on the merits.' " (*In re Harris* (1989) 49 Cal.3d 131, 135, quoting *People v. Greenwell* (1962) 203 Cal.App.2d 1, 4.)

The text of section 1001.36 refers eight times to the diversion it provides for as "pretrial." As one Court of Appeal observed: " 'pretrial *diversion*' connotes a diversion away from trial. One cannot divert a river *after* the point at which it has reached the sea." (*Graham, supra,* 64 Cal.App.5th at p. 833.) We also find it significant that the Legislature incorporated a definition of pretrial diversion that has been in existence for over 40 years. In 1977, the Legislature enacted a statutory scheme authorizing local jurisdictions to implement diversion programs pursuant to certain guidelines. (Former §§ 1001– 1001.10; Stats. 1977, ch. 574, § 2, pp. 1819–1821; see *Davis v. Municipal Court* (1988) 46 Cal.3d 64, 73–75 [discussing history of this legislative enactment].) Former section 1001.1 codified for the first time the definition of pretrial diversion now used, with minor grammatical variations, in several statutes, including section 1001.36: "pretrial diversion refers to the procedure of *postponing prosecution* either temporarily or permanently at any point in the judicial process from the point at which the accused is charged until adjudication." (Former § 1001.1, italics added.)[6] Consistent with the usual meaning of the defined term, appellate courts long have understood section 1001.1's definition of pretrial diversion as contemplating a request for diversion before trial begins. (See, e.g., *Gresher v. Anderson* (2005) 127 Cal.App.4th 88, 111–112 (*Gresher*); *People v. Padfield* (1982) 136 Cal.App.3d 218, 227–229 & fn. 8.) In

---

[6] The same definition also appears in sections 1001.50, subdivision (c), 1001.70, subdivision (b), and 1001.80, subdivision (k)(1). The current version of section 1001.1, adopted in 1982, contains nearly identical language, except to specify that it applies to "prosecution of an offense filed as a misdemeanor." (§ 1001.1; Stats 1982, ch. 42, § 2, p. 99.)

*Gresher*, for example, the court invalidated the Department of Social Services' policy that those in diversion are ineligible to apply for trustline registration (see Health & Saf. Code, §§ 1596.60, subd. (e), 1596.601) because they are " 'awaiting trial.' " (*Gresher*, at p. 111.) It reasoned: "The purpose of those programs is precisely to *avoid* the necessity of a trial." (*Ibid.*) Construing the definition of pretrial diversion set forth in section 1001.1, the court reasoned, "[g]iven that a *trial is not contemplated* without first holding a [hearing to terminate diversion], which is itself contingent on the person's performance, it cannot reasonably be said that persons in diversion programs are 'awaiting trial.' " (*Gresher*, at p. 111, italics added[7]; accord, *Padfield*, at p. 228 & fn. 8 [explaining that the purpose of pretrial diversion is to spare defendants the stigma of a criminal record and reduce court congestion, and observing that "[i]f the defendant has a legal right to pretrial diversion, then the court should not proceed to trial"].) Under well-established canons of statutory construction, "when the same word [or phrase] appears in different places within a statutory scheme, courts generally presume the Legislature intended the word [or phrase] to have the same meaning each time it is used." (*People v. Gray* (2014) 58 Cal.4th 901, 906; accord, *Frahs, supra,* 9 Cal.5th at p. 634 [the Legislature " 'is

---

[7] Contrary to the dissent's assertion (dis. opn. of Evans, J., *post*, at p. 8 & fn. 4), we do not interpret *Gresher*'s statements as dictum. The Department had argued that those on diversion were " 'awaiting trial.' " (*Gresher, supra,* 127 Cal.App.4th at p. 111.) In a three-paragraph analysis the court considered and rejected the Department's argument, relying on the language of various diversion statutes. (*Id.* at pp. 111–112.)

deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' "].)

Had the Legislature intended mental health diversion to be available up until the time of sentencing, it could easily have said so, as it has in other contexts. Section 1368, subdivision (a), for example, provides the court shall inquire about the defendant's mental competence if a doubt arises "during the pendency of an action and *prior to judgment*." (Italics added.) "[T]he terms 'judgment' and ' "sentence" ' are generally considered 'synonymous,' " and have a well-established meaning in the Penal Code. (*People v. McKenzie* (2020) 9 Cal.5th 40, 46 (*McKenzie*); see *People v. Karaman* (1992) 4 Cal.4th 335, 344, fn. 9; § 1191 et seq. [Title 8, "Judgment and Execution"].) Instead, the Legislature adopted a definition of "pretrial diversion" that has long been understood as referring to the period before trial begins.

The statute also provides for a grant of "pretrial diversion" "[o]n an accusatory pleading." (§ 1001.36, subd. (a).) It makes no mention of a diversion grant following "conviction," which would be the more logical terminology if diversion were also permitted after conviction by trial or plea. The statute contemplates several sources of "relevant and credible evidence" that can be used to determine if the defendant's mental disorder "was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) Those sources include, but are not limited to, "police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense." (*Ibid.*) The

enumerated sources are all categories of evidence available before trial. Although the list is not exclusive, the omission of any reference to the testimony of trial witnesses is noteworthy.

Likewise, the text provides that, upon a successful completion of diversion the court "shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (§ 1001.36, subd. (h).) This language contemplates that the defendant is facing "charges" "at the time" diversion is granted. The statute gives the court no authority to set aside a plea or trial verdict, which would be required if diversion were granted after "adjudication" of guilt by trial or plea. Further the Legislature specifically provides that if charges are dismissed, "the *arrest* upon which the diversion was based shall be deemed never to have occurred." (*Ibid.*, italics added.) Again the Legislature made no mention of setting aside a plea or trial result.

The statute also requires that the defendant "consent[] to diversion and waive[] the . . . right to a speedy trial," unless the defendant is mentally incompetent to do so. (§ 1001.36, subd. (c)(2).) In *Morse v. Municipal Court* (1974) 13 Cal.3d 149 (*Morse*), we considered similar language in the context of a 1972 statute (former § 1000.1) which diverted first time drug offenders away from criminal prosecution. The question there, as here, was "how far into the criminal process a defendant may go before he can no longer be afforded the right to consent to consideration for diversion under section 1000.1 and thereby secure the referral of his case to the probation department for investigation." (*Morse*, at p. 155, italics omitted.) We found "that the language of the code itself carrie[d] us a considerable distance" in answering that question. (*Id.* at p. 156.) Specifically, we observed that the statute's language

"unequivocally ma[de] a defendant's consent to consideration for diversion contingent upon a simultaneous waiver of speedy trial rights.[8]   In using such language the Legislature was surely aware of precedent decisions [citations] which recognize that the right to speedy trial is one which must be asserted prior to the actual commencement of trial, usually by means of a motion to dismiss made at the time the trial date is set or at the time the case is called for trial.  Accordingly, the plain meaning of the waiver of speedy trial language of section 1000.1 is that the defendant's consent to referral of his case to the probation department should be tendered to the district attorney prior to the commencement of trial." (*Id.* at p. 156.)  The statute, we concluded, established an affirmative restriction on the timing of a diversion request:  the "clear wording of the diversion provisions thus precludes a defendant from initiating diversion proceedings by tendering a consent after commencement of trial . . . ." (*Id.* at p. 157; see also *id.* at p. 160.)[9]  We interpret a similar timing restriction from section 1001.36's requirement that the defendant waive speedy trial rights in order to participate in diversion.[10]

---

**8**     The wording of the former statute, as quoted in *Morse*, provided:  " '[I]f the defendant *consents and waives his right to a speedy trial* the district attorney shall refer the case to the probation department.' " (*Morse, supra*, 13 Cal.3d at p. 156.)

**9**     *Morse* went on to conclude that the legislative policy to apply diversion liberally supported an interpretation that the defendant could request diversion anytime during the *pretrial* period. (*Morse, supra*, 13 Cal.3d at pp. 157–160.)

**10**     *Frahs, supra*, 9 Cal.5th 618 is not to the contrary.  There, addressing the retroactive application question, the People argued that section 1001.36's reference to "pretrial diversion"

At the same time, the statute sets forth no procedure for granting a mistrial or waiving double jeopardy. (See U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; Pen. Code, § 1023.) This absence supports a conclusion that the Legislature intended to require that the defendant request diversion *before* jeopardy attaches. Notably, both the *Graham* and *Curry* rules allow for midtrial diversion requests after jeopardy has attached but before verdicts have been reached. A waiver of the right to assert a once-in-jeopardy objection would be necessary in this

and its requirement of a speedy trial waiver signaled the Legislature's intent to deny retroactive application of the statute to those defendants whose trials had concluded and were no longer in a position to waive that right. (*Id.* at pp. 633, 636–637.) We rejected this logic, reasoning, "this language simply explains how the mental health diversion program will ordinarily function: In the normal course of operations, a trial court would determine before trial whether a defendant is eligible for pretrial diversion. This phrasing does not demonstrate a legislative intent to 'modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments' [citation] 'with sufficient clarity that a reviewing court can discern and effectuate it' [citation]." (*Id.* at pp. 633–634.) We further concluded that "the potential logistical problems identified by the People in providing defendants with a diversion eligibility hearing after conviction . . . do not provide a sufficient basis to deny defendants the benefit of a hearing altogether." (*Id.* at p. 636; see also *People v. Stamps* (2020) 9 Cal.5th 685, 705–709 [articulating special procedures for defendants seeking the benefit of an ameliorative statute for the first time on appeal].) But as the quoted language from *Frahs* and our discussion, *ante*, make clear, our inquiry under *Estrada* does not necessarily inform how a statute will operate prospectively to defendants whose guilt is adjudicated after the statute's effective date. For such persons, we conclude the Legislature's requirement of a speedy trial waiver conveys its intent to require that the defendant request diversion before the process of adjudicating guilt begins.

circumstance in the event that diversion fails and criminal proceedings are reinstated. (See § 1001.36, subd. (g).) Yet nothing in the statute anticipates the double jeopardy problem midtrial diversion would create, nor does it suggest how to overcome such issues. The lack of any elaboration of the rules that would be required to implement midtrial diversion suggests the Legislature did not intend to authorize such a procedure.

Finally, section 1001.36 is positioned in title 6 of part 2 of the Penal Code which is devoted exclusively to "Pleadings and Proceedings *Before Trial.*" (§ 976 et seq., italics added; see *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 343 [considering statute's placement in the code].) This section of the code covers arraignment (§ 976), setting aside the information or indictment (§ 995), and various other diversion programs.[11] It appears before, and separately from, the statutes covering the entry of a guilty plea (§ 1018), jury trial (§ 1093 et seq.), and sentencing (§ 1191 et seq.). All of these features are consistent with the conventional understanding of pretrial diversion: diverting a defendant's case out of the adjudicatory system before the process of determining guilt by trial or plea begins. Indeed, *Morse* found that section 1000.1's similar placement in the code "cured" "[a]ny ambiguity that might exist" about requiring the defendant to request diversion before

---

[11] Sections 1000 [drug diversion]; 1001.1 [pretrial diversion defined]; 1001.20 [diversion of defendants with cognitive developmental disabilities]; 1001.40 [diversion of traffic violators]; 1001.50 [diversion of misdemeanor offenders]; 1001.60 [bad check diversion]; 1001.70 [parental diversion]; 1001.80 [military diversion]; 1001.83 [primary caregiver diversion]; 1001.85 [law enforcement assisted diversion]; and 1001.95 [court-initiated misdemeanor diversion].

commencement of trial. (*Morse*, *supra*, 13 Cal.3d at p. 157, fn. 4.)

Braden and our dissenting colleagues offer several counterarguments in support of their view that the text of section 1001.36 entitled Braden to request diversion up until sentence was pronounced. The arguments fail to persuade.

Braden argues it is inappropriate to consider the plain meaning of the words "pretrial diversion" because section 1001.36 includes its own definition of that term. But as explained above, and as Braden acknowledges, section 1001.36(f)(1)'s reference to "until adjudication" is susceptible to more than one meaning. This ambiguity justifies considering the plain meaning of the term "pretrial diversion" in parsing the statutory language. (See *Busker*, *supra*, 11 Cal.5th at p. 1159.)

Our dissenting colleagues contend that interpreting the term "until adjudication" to mean "until entry of judgment" is the most natural reading of the statute because it does not require "elaboration, refinement, or insertion of additional words." (Dis. opn. of Evans, J., *post*, at p. 4.) The dissent further argues that such an interpretation "comports with the commonsense understanding that typically there is no adjudication of a matter until there is some outcome." (*Ibid*.) Braden echoes these arguments, and cites *McKenzie*, *supra*, 9 Cal.5th 40, for the proposition that a case is not adjudicated, and a judgment not issued, unless and until a sentence is rendered. The arguments overlook the reality that if the Legislature intended to allow mental health diversion up until the time of "judgment," it could have said so. But it did not. And, as noted *ante*, the definition of adjudication can mean either (1) "[t]he legal process of resolving a dispute; the process of judicially

deciding a case" or (2) the "judgment." (Black's Law Dict. (11th ed. 2019) p. 52, col. 1.) Interpreting the word "adjudication" to refer to a point in the process rather than a result of that process is not novel. As for Braden's reliance on *McKenzie*, that case is inapposite. There we considered at what point a case is reduced to a final judgment for purposes of *Estrada* retroactivity principles. (*McKenzie*, at pp. 44–46.) The case contained no discussion of the meaning of the word "adjudication."

Braden further argues that construing the word "adjudication" to mean the "legal process of resolving a dispute" (Black's Law Dict. (11th ed. 2019) p. 52, col. 1) upends the sentence structure of section 1001.36(f)(1). He urges that the legal process of resolving a dispute is not a single "point" in the process (§ 1001.36(f)(1)), but that the judgment is. This semantic argument is unconvincing. Our interpretation of the statute does indeed identify a discrete "point" in the judicial process: the point at which adjudication of the charges *begins*, either when trial commences or the defendant opts to forgo trial by entering a plea of guilty or no contest, whichever occurs first. Read most naturally, this is the "point" in the process that the statute identifies.

Significantly, interpreting "until adjudication," to permit diversion mid- or posttrial, produces considerable dissonance with the overarching concept of "*pretrial*" diversion. By contrast, interpreting "until adjudication" to require a request for diversion to be made before jeopardy attaches at trial or before defendant enters a guilty or no contest plea produces no such dissonance. As the Court of Appeal below reasoned: "If, as Braden would like, 'until adjudication' refers to a posttrial moment such as the time of sentencing, the definition of 'pretrial diversion' would be at odds with the ordinary meaning of the

word pretrial. That is, the very term being defined would be read out of the statute. That is not a tenable way to read a statute. Further, it is understandable why the Legislature used the term 'until adjudication' rather than a phrase such as 'until trial.' Most adjudications occur by guilty plea, rather than through trial, so defining 'pretrial' using the term 'until adjudication' encompasses both a plea hearing and an adjudication by trial." (*Braden*, *supra*, 63 Cal.App.5th at p. 337.)

Our dissenting colleagues resist this conclusion by arguing that the label "pretrial diversion" is simply a shorthand for how the statute generally will operate, rather than an affirmative time constraint on diversion requests. (Dis. opn. of Evans, J., *post*, at pp. 5–6.) But if that were true, the word "pretrial" would be unnecessary. The Legislature simply could have referred to "diversion" for persons suffering from mental disorders. Moreover, the definition of pretrial diversion in section 1001.36(f)(1) unquestionably contemplates a timeline: "[A]t any point in the judicial process *from* the point at which the accused is charged *until* adjudication . . . ." (Italics added.) The dissent's interpretation, which allows for pretrial diversion requests from the time of charging until sentencing effectively states *no* timeline because it would authorize diversion requests at any point when the trial court exercises jurisdiction over the case. This view renders the words "from the point at which the accused is charged until adjudication" superfluous.

Both Braden and the dissent question our reliance on *Morse*'s holding that the requirement of a speedy trial waiver amounts to an affirmative restriction on the timing of a diversion request, requiring that the request be made before trial begins. (*Morse*, *supra*, 13 Cal.3d at p. 156.) They contend *Morse* is inapposite due to variations between the statute at

issue there and section 1001.36, most notably, that former section 1000.1 did not expressly define pretrial diversion, while section 1001.36 does. (Dis. opn. of Evans, J., *post*, at p. 10, fn. 5.) But to the extent the phrase "until adjudication" is susceptible to more than one interpretation, the statute's separate requirement that the defendant waive speedy trial rights enlightens the meaning of that term. *Morse* directly addressed the significance of a speedy trial waiver in the context of a diversion statute and concluded that the requirement established an affirmative restriction on the timing of a diversion request. (*Morse*, at p. 157.)

Braden further observes that the Legislature amended the statute at issue in *Morse* (§ 1000.1) to expressly require, not only waivers of speedy preliminary and speedy trial rights, but also the waiver of a jury trial right itself (*id*., subd. (a)(3); Stats. 2017, ch. 778, § 2). Yet, it did not similarly amend section 1001.36. Based on this variance, Braden argues that "[t]he express omission that a defendant must waive his or her right to a jury trial to be considered for mental health diversion supports the construction that diversion is an option after a trial has begun." We read the statute differently. The Legislature's inclusion of a separate jury trial waiver in section 1000.1 means that defendants who fail drug diversion are only entitled to a court trial should criminal proceedings resume. By contrast, defendants who fail mental health diversion will be able to exercise their full jury trial right. As *Morse* explained, the requirement of a speedy trial waiver, applicable to both statutes, addresses a different issue: the *timing* of a defendant's request for diversion. (*Morse, supra,* 13 Cal.3d at pp. 157, 160.) In that respect, sections 1000.1 and 1001.36 remain the same.

Braden and the dissent look to section 1001.36, subdivision (e), which states that the court may require the defendant to make a prima facie showing of eligibility for diversion "[a]t any stage of the proceedings." Braden argues that this broad language includes sentencing, which is a stage of the proceedings. And the dissent reasons that it "defies logic" to read this phrase as excluding the trial, which is "the most widely known stage of the proceedings." (Dis. opn. of Evans, J., *post*, at p. 11.) But this language can also be understood to reflect that pretrial proceedings themselves have multiple stages. Significantly, subdivision (e) does not define the terms "pretrial diversion" or "until adjudication." Instead, it identifies the defendant's burden to make a prima facie showing that he or she "will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion." (*Ibid.*) Section 1001.36(f)(1) employs similar language, referring to postponement of the prosecution "at any point in the judicial process," but that language is qualified by the term "until adjudication." Likewise, subdivision (e)'s provisions are only as broad as the definition of "pretrial diversion" in subdivision (f)(1). In other words, the trial court may require the defendant to make a prima facie showing of eligibility "at any stage of the proceedings" in which the defendant is entitled to request diversion. Subdivision (e) does not assist us in understanding the definition of "pretrial diversion" in the first instance.

Finally, the dissent asserts that sections 1001.2 and 1001.51, dealing with misdemeanor diversion, authorize such diversion after the start of trial notwithstanding the same definition of pretrial diversion at issue here. (Dis. opn. of Evans, J., *post*, at p. 9.) In support, the dissent cites language in these

sections exempting certain "pretrial diversion or *posttrial* programs" from their scope, and expressly stating that their provisions should not be read to authorize "pretrial diversion or *posttrial* programs" for certain Vehicle Code offenses. (§ 1001.2, subd. (a), italics added; see also § 1001.51, subd. (b).)[12] The dissent cites no authority, and we have found none, construing this exclusionary language to mean that misdemeanor diversion may be ordered after the start of trial. On the contrary, the statutes' separate references to pretrial diversion "or" posttrial programs suggests the opposite.[13]

---

[12] The language, in context, reads as follows: "This chapter shall not apply to any pretrial diversion or posttrial programs for the treatment of problem drinking or alcoholism utilized for persons convicted of one or more offenses under Section 23152 or 23153 or former Section 23102 of the Vehicle Code or to pretrial diversion programs established pursuant to Chapter 2.5 (commencing with Section 1000) of this title nor shall this chapter be deemed to authorize any pretrial diversion or posttrial programs for persons alleged to have committed violation of Section 23152 or 23153 of the Vehicle Code." (§ 1001.2, subd. (a).) "This chapter shall not apply to any pretrial diversion or posttrial program otherwise established by this code, nor shall this chapter be deemed to authorize any pretrial diversion or posttrial program for any person alleged to have committed a violation of Section 23152 or 23153 of the Vehicle Code." (§ 1001.51, subd. (b).)

[13] The dissent further contends that the diversion scheme for individuals with cognitive disabilities (§§ 1001.20–1001.34) authorizes diversion after trial begins despite sharing several of the same features present in section 1001.36 that we have relied upon to support a contrary conclusion. (Dis. opn. by Evans, J., *post*, at p. 10, fn. 6.) Again, the dissent cites no authority for this proposition, and we have found none. The diversion scheme for individuals with cognitive disabilities, operative January 1,

### B. Section 1001.36 and Statutes Governing Incompetence to Stand Trial and Victim Restitution

Both Braden and our dissenting colleagues look to the interplay between section 1001.36 and the statutes governing incompetence to stand trial (§ 1368 et seq.) to support the argument that mental health diversion may be requested up until sentencing. (Dis. opn. of Evans, J., *post*, at pp. 13–16.) They reason that, when the Legislature created mental health diversion, it also amended section 1370 to authorize trial courts to grant mental health diversion when a defendant is found mentally incompetent to stand trial. (§ 1370, subd. (a)(1)(B)(iv), (v); as amended by Stats. 2018, ch. 34, § 25.) Because an incompetency finding can occur midtrial, or even up until sentencing (see § 1368, subd. (a); *People v. Rogers* (2006) 39 Cal.4th 826, 847), section 1370 authorizes mental health diversion at these later times. According to Braden, our construction of section 1001.36 would effectively make the portions of section 1370 that allow for diversion after trial commences surplusage.

The argument presumes that there is one uniform timeline that governs referral to mental health diversion for all defendants, whether competent or incompetent. Not so. There are significant differences between competent and incompetent defendants that would cause the Legislature to adopt a more flexible timeline for mental health diversion in the latter group.

2021, (Stats. 2020, ch. 11, § 23) has not yet been construed by any appellate court. We decline to undertake that task here. It is sufficient for our purposes to note that this scheme does not include the definition of pretrial diversion that is the focus of our discussion.

An incompetent person is incapable of adequately defending against a charge. Thus, under the federal Constitution, an incompetent defendant cannot be tried, convicted, or punished. (*Drope v. Missouri* (1975) 420 U.S. 162, 171–172; see § 1367, subd. (a); 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) §§ 820, 821, pp. 1255–1258.) A doubt about the defendant's competency can arise at any time before judgment is pronounced (§ 1368, subd. (a)), and the statute imposes on the trial court a sua sponte duty to evaluate competency at any time such a concern arises (*ibid.*; *Hale v. Superior Court* (1975) 15 Cal.3d 221, 226; *People v. Aparicio* (1952) 38 Cal.2d 565, 568; Witkin & Epstein, *supra*, § 825, at pp. 1262–1263). Failure to comply with section 1368's mandate goes to the legality of the proceedings and results in an act in excess of jurisdiction. (*People v. Superior Court* (*Marks*) (1991) 1 Cal.4th 56, 64–71; Witkin & Epstein, *supra*, §§ 821, 828, at pp. 1255–1256, 1268–1270.) By incorporating the provisions of section 1001.36 into the competency statutes, the Legislature signaled its intent to have mental health diversion operate in tandem with an incompetency finding, whenever it arises before judgment.

Mental health diversion for competent defendants works differently. There is no question that the court has jurisdiction over defendants who are competent to stand trial and assist in their own defense. Competent defendants are capable of, and required to, request diversion, consent to it, demonstrate their eligibility, waive the right to a speedy trial, and agree to comply with treatment. (§ 1001.36, subd. (c)(2) & (3).) "Nowhere . . . does the scheme mandate a sua sponte duty for trial courts to consider mental health diversion" (*People v. Banner* (2022) 77 Cal.App.5th 226, 235), and the court's decision to refer the

defendant to mental health diversion is discretionary (§ 1001.36, subd. (a)). The inquiry focuses on whether the defendant has been diagnosed with a specified mental disorder that was a significant factor in the commission of the offense. (§ 1001.36, subd. (b).)

Such a condition is not a moving target, as can be the case with a person who becomes incompetent to be tried even after charges have been brought. To support a diversion request, the condition in question must exist at the time of the offense. Section 1001.36, subdivision (b)(1) places the burden on the defendant to provide evidence in support of the diversion request, including the existence of a mental health disorder. Accordingly, when such a showing can be made there is reason to incentivize a competent defendant to make a timely request for diversion to encourage early intervention and obviate the need for trial.

Incompetent individuals cannot agree to the diversion requirements and the court cannot preside over their trial or impose sentence on them. The question of incentivizing a defendant's agreement to treatment simply does not arise. Rather, as discussed in further detail below (see pt. II.D., *post*), the availability of diversion for individuals found incompetent to be tried was added to reduce the burden of housing such individuals by the State Department of State Hospitals.

The wording of the statutory scheme bears out these differences. Section 1370, subdivision (a)(1)(B)(iv)(I) provides broadly that the court may make a finding that the defendant is an appropriate candidate for mental health diversion "*at any time* after the court finds that the defendant is mentally incompetent and before the defendant is transported to a facility

pursuant to this section . . . ." (Italics added.) Even after the defendant has been transferred to a facility, the court may make such a finding "*at any time* upon receiving any information that the defendant may benefit from diversion . . . ." (*Id.*, subd. (a)(1)(B)(iv)(II), italics added.) Section 1370, subdivision (a)(1)(B)(v) makes clear that it establishes independent authorization for the court to consider mental health diversion pursuant to the timeline set out in that statute. It provides: "If a defendant is found by the court to be an appropriate candidate for diversion *pursuant to clause* (*iv*), the defendant's *eligibility* shall be determined pursuant to Section 1001.36." (*Id.*, subd. (a)(1)(B)(v), italics added; accord, § 1370.01, subd. (b)(1)(A) [upon a finding of incompetence, the court may "[c]*onduct a hearing*, pursuant to [section 1001.36], and, if the court deems the defendant *eligible*, grant diversion" pursuant to that section], italics added.) Under section 1001.36, the question of the defendant's *eligibility* for diversion (*id.*, subd. (b)(1)) is separate from the timeliness of the request (*id.*, subd. (f)(1)).

Other aspects of section 1001.36 similarly distinguish between competent and incompetent defendants. Section 1001.36 specifically excepts incompetent persons from the statutory requirements that they consent to diversion, waive speedy trial rights, and agree to comply with treatment. (§ 1001.36, subd. (c)(2), (3).) These variances defeat the call for parallel construction between the timelines governing referral of competent and incompetent defendants to mental health diversion. Instead, the Legislature expressly authorized mental health diversion under section 1370 any time a finding of incompetency is made, thus creating a specific exception to the timeline in section 1001.36 that governs a diversion request by a defendant who is competent to stand trial.

26

Braden's reliance on the provisions governing victim restitution is similarly misplaced. He notes that section 1001.36, subdivision (f)(1)(D) provides that the trial court, upon request, shall conduct a hearing to determine whether restitution is owed to any victim as a result of the diverted offense, and order payment of restitution during the diversion period. Under the general restitution statutes, restitution is triggered by a conviction (§ 1202.4, subd. (a)(1)), and is ascertained at or after sentencing (*id*., subd. (f)(3)). Braden argues that "[s]ince a person who is granted mental health diversion under section 1001.36 can be ordered to pay restitution, the statute must contemplate [that] the granting of diversion should be treated as a 'diversion sentence' and include [the period] *after* the determination of guilt at *sentencing*."

We are not persuaded. Section 1001.36 subdivision (f)(1)(D) simply provides that the trial court can extend to a defendant all the benefits of mental health diversion, yet also make a victim whole by ordering the payment of restitution that would normally be ordered at sentencing. In this situation, a court is not forced to choose between assisting a defendant with mental health concerns and ordering restitution for a victim. This approach makes sense. A main feature of the diversion system is to allow the court to intervene early to support a defendant's rehabilitation and recovery without the stigma of a conviction. But, as with probation conditions, agreeing to make victim restitution can also be part of the rehabilitative and therapeutic process. The inclusion of restitution in this context honors the victims' interest in being made whole when they are injured by competent defendants who are willing to address the harmful consequences of their actions, and to seek treatment for the underlying causes of their behavior. It reflects a legislative

policy choice to consider the interests of defendants and victims alike.

*C. Legislative Purpose*

Both Braden and the dissent argue that interpreting section 1001.36(f)(1)'s definition of "pretrial diversion" to require a diversion request before trial begins or a plea of guilty or no contest is entered contravenes the Legislature's intent to have mental health diversion apply as broadly as possible. For support, they look to the Legislature's codified statement of purpose, which appears in section 1001.35. (See *People v. Bryant* (2021) 11 Cal.5th 976, 987; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925.) That section states: "The purpose of this chapter is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [And] [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.) Braden observes that in *Frahs*, we relied on section 1001.35's policy statements to conclude that " 'the Legislature intended the mental health diversion program to apply as broadly as possible,' " so that defendants like Frahs, whose cases were not final on appeal, could take advantage of the new enactment. (*Frahs*, *supra*, 9 Cal.5th at p. 632.)

Braden and the dissent also look to newly enacted section 17.2, which provides: "(a) It is the intent of the Legislature that the disposition of any criminal case use the least restrictive

means available. [¶] (b) The court presiding over a criminal matter shall consider alternatives to incarceration, including, without limitation, collaborative justice court programs, diversion, restorative justice, and probation. [¶] (c) The court shall have the discretion to determine the appropriate sentence according to relevant statutes and the sentencing rules of the Judicial Council." (Added by Stats. 2022, ch. 775, § 2, eff. Jan. 1, 2023.) Braden asserts that "[f]ulfilling these purposes calls for broad application of the statute to as many qualified people as possible, which would require diversion to be available until sentence is imposed. If the law *could* apply to a person, the underlying policy calls for applying it." The dissent agrees: "[W]hile earlier diversion consideration is better, later is still good." (Dis. opn. of Evans, J., *post*, at p. 20.)

Contrary to these assertions, interpreting section 1001.36 to include a timeliness requirement is not inconsistent with the Legislature's stated goals regarding diversion. Our holding today does not change the eligibility criteria or limit *who* is eligible for diversion. (See § 1001.36, subd. (b).) Instead, it establishes *when* eligible individuals must make a diversion request.

Nor is it true that only the broadest possible reading of an ameliorative statute can be deemed consistent with the Legislature's purpose in enacting such a statute. When section 1001.36 was enacted, it had long been recognized that the purpose of pretrial diversion programs "is precisely to *avoid* the necessity of a trial." (*Gresher*, *supra*, 127 Cal.App.4th at p. 111.) As one Court of Appeal observed, "Were we to construe section 1001.36 to permit a defendant to seek pretrial diversion after the adjudication of guilt or after a plea (ostensibly, by construing the term 'adjudication' to mean 'entry of judgment'), we would

be inviting the inefficient use of finite judicial resources." (*Graham, supra,* 64 Cal.App.5th at pp. 833–834.) By contrast, "[r]equiring diversion requests before trial encourages defendants to make their request to be exempted from the criminal process before they invoke the most burdensome aspect of it." (*Braden, supra,* 63 Cal.App.5th at pp. 341–342.)[14] The Legislature did not adopt a definition of pretrial diversion specific to the mental health context. Rather, as noted above, it employed a definition that had been in existence since 1977. Given the statutory scheme of which section 1001.36 is a part, and the longstanding definition of "pretrial diversion" incorporated therein, we conclude that among the Legislature's goals was conservation of judicial resources. The Legislature's codified statement of purpose to have diversion apply broadly cannot override its express language applying the statute to "pretrial diversion." (See *In re Gadlin* (2020) 10 Cal.5th 915, 940–942 (*Gadlin*).)

Although limiting diversion to pretrial requests might foreclose some otherwise potentially meritorious diversion claims, the Legislature was entitled to conclude that doing so would create better incentives to expeditiously surface and

---

[14] We note that, in terms of inefficiencies, the *Graham* rule, which allows for midtrial diversion requests up until verdicts are returned, is most likely to result in wasted judicial resources. In the case of a jury trial, advocates must prepare for trial, the jury will be empaneled, witnesses assembled, and evidence presented. If the defendant makes a prima facie showing for relief, the trial court would be required to dismiss the jury without completing the trial or receiving verdicts. Further, section 1001.36 does not require a jury trial waiver upon request for diversion, so the case could well require a second jury trial if diversion is unsuccessful.

address mental health concerns, and that other forms of posttrial relief are sufficient to address mental health issues in a posttrial setting. Notably, while section 17.2 states a preference for the least restrictive criminal disposition, the Legislature's use of the words "available" and "according to relevant statutes and the sentencing rules of the Judicial Council" indicate that the Legislature did not intend to alter existing statutory requirements, including section 1001.36's timeliness requirement.

In the end the Legislature has chosen an approach which strikes a balance. Requiring that a request be made before trial begins makes a diversion request available for all who qualify. If diversion is deemed appropriate, a grant saves pretrial expenditures, including those attendant on repeated appearances and pretrial custody costs, as well as resources consumed by trials. Encouraging resort to early mental health treatment can increase the chances for therapeutic success and protect both the public and the defendant from future burdens resulting from treatable mental health conditions. (See pt. II.D., *post*.)

Braden's counsel acknowledged at oral argument that it would be unusual for defense counsel to become aware only during trial that the defendant has a mental health disorder that factored significantly in the commission of the offense. This is the type of evidence that the defense would be expected to develop early if relevant to a disputed issue at trial. Once defense counsel announces ready for trial, he or she will most often be well aware of evidence that would support a request for

diversion.[15]  The defense is likewise empowered to delay the entry of plea and to waive time for trial in order to investigate further or consider whether the defendant is "willing to embrace" mental health treatment.  (Dis. opn. of Evans, J., *post*, at p. 21.)  Given all of these considerations, the dissent's concern that today's ruling will severely compromise early intervention is unfounded.  (Dis. opn. of Evans, J., *post*, at pp. 15–16, 19–22.)

Moreover, it is important to note that the trial court is not without means to address a defendant's mental disorder in the context of sentencing a defendant who has been convicted by trial or plea.  Even before section 1001.36 was enacted, a court could place the defendant on probation on the condition that he or she cooperate with mental health treatment.  That option

---

[15]  Such was the case here.  Braden's family members advised police of his schizophrenia diagnosis when they called for emergency assistance.  Police dispatch made the responding officer aware of that diagnosis.  It appears that Braden, who was deemed competent to represent himself, was unaware of section 1001.36's pretrial diversion program, which became effective shortly before his trial.  The issue was raised for the first time after counsel was appointed to assist Braden at sentencing.  The general rule is that defendants who validly choose to represent themselves are charged with knowing the law.  Braden's pro se status is therefore not a ground for excusing his failure to seek mental health diversion in a timely manner.  (See *People v. Espinoza* (2016) 1 Cal.5th 61, 75.)

Nor does Braden argue that he should be excused from failing to timely seek mental health diversion before trial because he could not have anticipated the meaning we have attributed to the term "until adjudication" in section 1001.36.  (Cf. *People v. Black* (2007) 41 Cal.4th 799, 810–812; *People v. Turner* (1990) 50 Cal.3d 668, 703–704; *In re Gladys R.* (1970) 1 Cal.3d 855, 861.)

remains available and successful completion of probation is grounds to have a conviction vacated. (§ 1203.4, subd. (a)(1).)

In sum, although the phrase "until adjudication" (§ 1001.36(f)(1)), standing alone, is susceptible of more than one meaning, we resolve that ambiguity in light of the language of section 1001.36 as a whole and the entire statutory scheme governing diversion, including the Legislature's codified statement of purpose. Accordingly, we hold that, to be timely, a request for diversion must be made before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first. This interpretation best comports with the concept of "pretrial diversion," harmonizes section 1001.36 within the statutory scheme, and is consistent with the Legislature's goals to accelerate mental health diversion, reduce pretrial incarceration, and preserve finite judicial resources. We disapprove *People v. Graham*, *supra*, 64 Cal.App.5th 827, and *People v. Curry*, *supra*, 62 Cal.App.5th 314, to the extent they are inconsistent with the holding here.

While the dissent offers several reasons why permitting mental health diversion until entry of judgment might be a preferable policy, the statutory language and contextual scheme point in a different direction. Of course, if the Legislature wishes to expand the window during which a request may be made it is free to amend the statute. But that is a policy choice for the Legislature to make.

### D. *Legislative History Materials*

Having reached this conclusion based on the statutory language and its context, "we need go no further." (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758.) Nonetheless, even if we were to consider extrinsic aids, a review

of the legislative history of section 1001.36 comports with our reading of the statute. (See, e.g., *Gadlin*, *supra*, 10 Cal.5th at p. 936; *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1067.)

Section 1001.36 came into existence by a somewhat complex legislative process, which was aptly summarized in *Tellez v. Superior Court* (2020) 56 Cal.App.5th 439 (*Tellez*). We draw liberally from that discussion here. "Before the enactment of Penal Code section 1001.36, two different bills proposed pretrial mental health diversion. The bill that ultimately enacted Penal Code section 1001.36 was Assembly Bill No. 1810 (2017–2018 Reg. Sess.)." (*Tellez*, at p. 445; Stats. 2018, ch. 34, § 24, eff. June 27, 2018.) "Assembly Bill 1810 was an 'omnibus health' budget trailer bill authored by the Assembly Committee on Budget. (Stats. 2018, ch. 34, § 37; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1810 (2017–2018 Reg. Sess.), as amended June 12, 2018, p. 1.) . . . [As first introduced,] the bill contained only one section and merely stated that the Legislature intended 'to enact statutory changes relating to the Budget Act of 2018.' (Assem. Bill 1810 (2017–2018 Reg. Sess.) as introduced Jan. 10, 2018.) The Senate amended the bill in June and added 37 sections, including the one that became Penal Code section 1001.36. (Sen. Amend. to Assem. Bill 1810 (2017–2018 Reg. Sess.) June 12, 2018.)" (*Tellez*, at pp. 445–446.)

"Senate Bill No. 215 (2017–2018 Reg. Sess.) . . . separately proposed mental health diversion, and it eventually amended Penal Code section 1001.36" to address restitution for diverted offenses and to set forth a list of ineligible offenses. (*Tellez*, *supra*, 56 Cal.App.5th at p. 445; see *id*. at p. 447; Stats. 2018, ch. 1005, § 1, eff. Jan. 1, 2019.) The mental health diversion language was added to the bill on January 3, 2018, predating

the introduction of such language in Assembly Bill No. 1810 (2017–2018 Reg. Sess.) (Assembly Bill 1810). (Sen. Amend. to Sen. Bill No. 215 (2017–2018 Reg. Sess.) Jan. 3, 2018.) Senate Bill No. 215 (2017–2018 Reg. Sess.) (Senate Bill 215) contained the same definition of "pretrial diversion" and the same requirement of a speedy trial waiver eventually enacted in section 1001.36. (Sen. Amend. to Sen. Bill No. 215 (2017–2018 Reg. Sess.) Jan. 3, 2018.) *Frahs, supra*, 9 Cal.5th at page 635 considered legislative history materials related to Senate Bill 215 in ascertaining the Legislature's intent. Likewise, both Braden and the Attorney General rely on various legislative history materials related to Assembly Bill 1810 and Senate Bill 215, and we have granted their unopposed requests to take judicial notice of those documents.

Braden and the dissent argue that the legislative history of section 1001.36 reflects the Legislature's goal to provide mentally ill offenders with treatment, rather than incarceration. One analysis of Senate Bill 215 included the author's statement that " '[r]oughly a third of inmates in California's jails suffer from serious mental illness' " and California's jails are " 'ill-equipped' " to treat such conditions or to deal with the housing and staffing demands such prisoners present. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 25, 2018, p. 5; *id.* at pp. 5–6 [summarizing statistics on incarcerated mentally ill offenders].) Another analysis observed that "[t]he goal of the diversion program created by this bill is to address the population of jail inmates who suffer from a mental disorder whose incarceration often leads to worsening of their condition and in some cases suicide." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 3, 2018, p. 7.) The

legislative history recounted other deleterious effects, such as the inability of inmates with mental health conditions to function within the prison system and the tendency of incarceration to aggravate these preexisting conditions. (*Id.* at p. 4; Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 8.) Braden reasons that, "[b]y focusing on getting mentally ill defendants the treatment they need prior to being incarcerated, the Legislature made clear [its] intention to give courts the ability to grant mental health diversion at any time before a defendant is incarcerated, which strongly supports the interpretation that diversion was meant to be an available option until sentence is imposed."

Reducing the incarceration of mentally ill defendants was one legislative purpose, but it did not stand alone. (See *Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 663–664.) Rather, the available legislative history bears out that the Legislature also considered the benefits to the defendant and the judicial system of having diversion occur *pretrial.* The author's statement in support of Senate Bill 215 explained that the statute was designed to remedy problems associated with the inability of trial courts to "order mental health treatment, relevant counselling, or adherence to a medication regime unless the [defendant] *was first convicted,* and then placed on probation or sent to jail at county expense." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2, italics added.) The comments continue: "The predictable results of California's reliance on this outdated method are higher costs for taxpayers, who are forced to pay for the continuous warehousing of the mentally ill, when *early, court-assisted interventions* are far

more likely to lead to longer, cheaper, more stable solutions for the community, and for the person suffering from mental illness. [¶] . . . By granting courts the ability to divert those suffering from mental illness into treatment *at an early stage in the proceedings*, [Assembly Bill] 1810 seeks to reduce recidivism rates for mentally ill defendants, and to avoid unnecessary and unproductive *costs of trial* and incarceration." (*Id.* at pp. 2–3, italics added.) A Judicial Council task force concurred that "interventions and diversion possibilities must be developed and utilized *at the earliest possible opportunity.*" (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 6, italics added.) In assessing the fiscal effect of the legislation, one analyst observed that the cost of publicly funded programs "could be offset by savings achieved through reduced workload in *not preparing for and litigating cases to trial.*" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 25, 2018, p. 6, italics added; see also Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 5 [because diversionary sentences " 'take advantage of existing community resources for the mentally ill, research suggests that such sentences will save counties money in the short-term on *reduced trial* and incarceration costs, and in the long-term based on reduced recidivism rates' " (italics added)].)

Moreover, the legislative history materials reflect that the Legislature considered the benefit to defendants of being diverted *before* suffering a conviction. The author's statement in support of Senate Bill 215 observed that, under current laws, trial courts were not able to rehabilitate mentally ill offenders " 'without first convicting them of the underlying offense, thereby damaging their prospects for future employment and

housing.' " (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 5.) The author explained that "[b]y reserving court-ordered services for the mentally ill until after a conviction, the prior system led to higher recidivism rates for mentally ill Californians, who were not only left untreated, but with *the additional burden of a criminal record*. This approach was unfair, impractical *and costly*." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 215, *supra*, p. 2, italics added.) By contrast, under the proposed legislation to enact section 1001.36, " 'a court may (but is not required to) impose the same rehabilitative probationary conditions on a defendant it would have imposed *had the defendant been convicted* (including that the defendant comply with a mental health treatment plan, obey all laws and make restitution to any victims), with the added incentive that successful completion of diversion would result in dismissal of the criminal case, *without the permanent detriment of a criminal record*." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 5, italics added.) As one analyst emphasized, "[b]ecause *diversion does not result in a conviction*, once a defendant completes diversion he or she would not be foreclosed from housing and employment opportunities." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 7, italics added; see also *ibid*. [explaining that the proposed legislation authorizes a court "to order treatment early in the process *rather than waiting for the disposition of the case*" (italics added)].)

The comments in one analysis of Senate Bill 215 emphasized the difference between pretrial diversion and deferred entry of judgment: "In deferred entry of judgment, a defendant determined by the prosecutor to be eligible for

deferred entry of judgment must plead guilty to the underlying drug possession charge. The court then defers entry of judgment and places the defendant in a rehabilitation and education program. If he or she successfully completes the program, the guilty plea is withdrawn and the arrest is deemed to have not occurred. If the defendant fails in the program, the court imposes judgment and sentences the defendant. [¶] In pretrial diversion, the criminal charges against an eligible defendant are set aside and the defendant is placed in a rehabilitation and education program treatment. If the defendants successfully complete the program, the arrest is dismissed and deemed to not have occurred. If the defendant fails in the program, criminal charges are reinstated. . . . [¶] This bill would give the courts the authority to grant pretrial diversion to defendant charged with misdemeanors or felonies that are punishable in county jail under Realignment, if the defendant has a mental illness, the mental illness played a significant role in the commission of the offense, and the defendant would benefit from mental health treatment." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, pp. 6–7.) The comments to Senate Bill 215 likewise emphasized the existing definition of pretrial diversion as "the procedure of postponing prosecution of an offense filed as a misdemeanor either temporarily or permanently at any point in the judicial process from the point at which the accused is charged until adjudication." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 215, *supra*, p. 1; Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215, *supra*, p. 1.) These comments indicate that the Legislature understood the existing definition of pretrial diversion as well as the difference between pretrial diversion and deferred entry of judgment.

Finally, the legislative history materials reflect the Legislature's goal to reduce the number of persons referred to the State Department of State Hospitals after having been found incompetent to stand trial under section 1370. (Assem. Con. Sen. Amends. to Assem. Bill No. 1810 (2017–2018 Reg. Sess.) as amended June 12, 2018, p. 7; Cal. Health & Human Services Agency, Enrolled Bill Rep. on Sen. Bill No. 215 (2017–2018 Reg. Sess.) prepared for Governor Brown (Sept. 4, 2018) pp. 1–2.) As explained *ante*, the provisions of section 1370 achieve this goal by broadly authorizing the trial court to consider a defendant for diversion "at any time after the court finds that the defendant is mentally incompetent and before the defendant is transported to a facility" (*id.*, subd. (a)(1)(B)(iv)(I)) or, after the defendant is transported, "at any time upon receiving any information that the defendant may benefit from diversion" (*id.*, subd. (a)(1)(B)(iv)(II)).

The dissent urges that today's opinion "narrowly fixates on the need to avoid costs of jury trials" when the Legislature's primary purpose was to avoid the costs associated with incarceration and recidivism. (Dis. opn. of Evans, J., *post*, at p. 18.) Our dissenting colleagues assert that the vast majority of cases are resolved by plea agreement and that the "costs of jury trials pale in comparison to the greater costs the Legislature had in mind — namely, costs associated with incarceration and recidivism." (*Ibid.*) But as explained above, the dissent overstates the risk that imposing a timeline will leave defendants unable to avail themselves of diversion or otherwise receive mental health assistance as a condition of probation. Moreover, the dissent's interpretation of the statute would incentivize jury trials, as well as delay treatment. A defendant could wait until trial to seek an acquittal. Then, if convicted,

the defendant could request diversion. Requiring a defendant to request diversion before proceeding to trial avoids such wasted resources and also assists the defendant by accelerating therapeutic intervention rather than incurring additional delay by waiting for trial. (*Graham, supra,* 64 Cal.App.5th at pp. 833–834; *Braden, supra,* 63 Cal.App.5th at pp. 341–342.) At the same time, the statute does not require the defendant to plead guilty or waive the right to jury trial in order to participate in diversion. If a diversion referral proves unsuccessful, the defendant may still exercise the jury trial right.

Ultimately, it is for the Legislature to decide how to balance, on the one hand, reducing costs of incarceration and recidivism and, on the other, conserving judicial resources and encouraging early intervention. Avoiding trial through "pretrial diversion" benefits the defendant, as well as victims and witnesses and the system itself. The available legislative history bears out that the Legislature considered these benefits, and supports our interpretation of section 1001.36 to require that a request for mental health diversion be made before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first.

### *E. Rule of Lenity*

Finally, Braden invokes the rule of lenity to argue that any ambiguity in the statute's scope should be resolved in his favor. "[W]e have repeatedly stated that when a statute *defining a crime or punishment* is susceptible of two reasonable interpretations, the appellate court should ordinarily adopt that interpretation more favorable to the defendant." (*People v. Avery* (2002) 27 Cal.4th 49, 57, italics added.) It is not apparent that the rule of lenity would extend to a procedural rule

governing the timeliness of a diversion request. But even when properly invoked, the rule applies " 'only if the court can do no more than guess what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule.' " (*Id.* at p. 58; accord, *People v. Manzo* (2012) 53 Cal.4th 880, 889.) In other words, "the rule of lenity is a tie-breaking principle, of relevance when ' "two reasonable interpretations of the same provision stand in relative equipoise . . . ." ' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30.) We do not face such uncertainty here. The language and structure of the statute, its placement in the code, the settled provisions of pretrial diversion, and the legislative history all point to an understanding that the Legislature intended to require that a defendant request pretrial mental health diversion before jeopardy attaches at trial or before the entry of a plea of guilty or no contest, whichever occurs first.

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. BRADEN

S268925

Dissenting Opinion by Justice Evans

Cory Juan Braden, Jr., was involved in a confrontation with his sister. Their mother intervened and Braden physically assaulted her. Braden's sister called 911 for assistance and informed the dispatcher that Braden was schizophrenic and was off his medication. Braden fought with a responding deputy and was charged with resisting arrest and with having two prior strikes. Braden represented himself at trial and a jury convicted him. Before sentencing, he requested an attorney. The attorney promptly requested that Braden be considered for mental health diversion under Penal Code[1] section 1001.36. After denying the motion as untimely and moot,[2] the trial court sentenced Braden to four years in state prison.

The question in this case is whether a trial court has the discretion to consider a defendant's request for mental health diversion up until the entry of judgment. Based on the legislative history, the plain language of the statute, and the

---

[1] All further unspecified statutory references are to the Penal Code.

[2] In summarily denying Braden's mental health diversion request, the court remarked that it would have denied the motion as a matter of discretion had it not found it to be untimely and moot. The court's alternate ruling was invalid because it was not based on any apparent consideration of whether Braden was eligible or suitable for diversion. (See § 1001.36, subds. (b)–(c).)

1

overall scheme of which it is a part, I would hold trial courts have such discretion. Thus, I respectfully dissent.

Section 1001.36 allows defendants to request mental health diversion "at any point in the judicial process from" the time they are charged "*until adjudication.*" (*Id.*, subd. (f)(1), italics added.) The majority opinion holds that the statute's reference to "until adjudication" requires a defendant to request diversion "before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first." (Maj. opn., *ante*, at p. 1.) In so holding, contrary to legislative intent, the majority divests trial courts of the discretion to grant mental health diversion to suitable, mentally ill defendants. The Legislature can correct today's decision by expressly clarifying that the phrase "until adjudication" in section 1001.36 means until entry of judgment.

Today's decision marks a retreat from our recognition in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*) of "[t]he breadth of the statute's statement of purpose — aimed to '[*i*]*ncrease*[] *diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system.' " (*Id.* at p. 632.) Although we did not squarely address the meaning of "until adjudication," we understood that "[t]he Legislature could well have intended to allow judges to decide under the statute whether a defendant's mental disorder was a 'significant factor in the commission of the charged offense' [citation] even after a verdict . . . ." (*Id.* at p. 636.) While the majority discounts *Frahs* on the grounds it concerned the issue of retroactivity, *Frahs*'s recognition of mental health diversion's legislative purposes, its import, and its features applies with equal force as we consider the "timeliness" issue before us today.

## I.

This case presents an issue of statutory interpretation. The mental health diversion statute, section 1001.36, authorizes courts to grant "pretrial diversion" to people with mental health conditions to divert them out of the carceral system and into treatment if they do not pose an unreasonable risk to public safety. Section 1001.36, subdivision (f)(1) defines "pretrial diversion" as "postponement of prosecution . . . at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ."

In interpreting the meaning of a statute, the fundamental task of courts is to determine the Legislature's intent in order to effectuate the statute's purpose. (*First Student Cases* (2018) 5 Cal.5th 1026, 1034–1035.) We first consider whether the plain meaning of the statute is unmistakably clear from the statute's text. (*Id.* at p. 1035.) We construe the statute's language " 'in the context of the statutory framework, seeking to discern the statute's underlying purpose and to harmonize its different components.' " (*Ibid.*) We must interpret a statute " ' "with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 (*Kavanaugh*).) "In order to ascertain a statute's most reasonable meaning, we often examine its legislative history." (*Id.* at p. 920.)

### A. *The Language of Section 1001.36*

In interpreting the phrase "until adjudication," the majority defines "adjudication" to mean "attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever

occurs first." (Maj. opn., *ante*, at p. 1.) But the more natural reading is that "until adjudication" means "until entry of judgment." (See Black's Law Dict. (11th ed. 2019) p. 52, col. 1) [defining adjudication as either (1) "[t]he legal process of resolving a dispute; the process of judicially deciding a case" or (2) the "judgment"].) Unlike the definition adopted by the majority opinion, the latter definition does not require any need for elaboration, refinement, or insertion of additional words. It also comports with the commonsense understanding that typically there is no adjudication of a matter until there is some outcome.[3] (*Kavanaugh, supra*, 29 Cal.4th at p. 919 [we must be "careful to give the statute's words their plain, commonsense meaning"].) And it is in harmony with the Legislature's intent that "the *disposition* of any criminal case use the least restrictive means available" and effectuates its corresponding mandate that trial courts consider alternatives to incarceration, such as diversion. (§ 17.2, subd. (a), added by Stats. 2022, ch. 775, § 2, eff. Jan. 1, 2023, italics added; see Stats. 2022 ch. 775, § 1, subds. (a), (b) ["California's overreliance on incarceration has failed to improve public safety while disproportionately harming vulnerable and marginalized communities" and "California can . . . mak[e] greater use of alternatives to

---

[3] The majority asserts this interpretation "effectively states *no* timeline because it would authorize diversion requests at any point when the trial court exercises jurisdiction over the case" and therefore "renders the words 'from the point at which the accused is charged until adjudication' superfluous." (Maj. opn., *ante*, at p. 19.) The majority is mistaken. The deadline is the one the Legislature set: defendants may request and courts may order mental health diversion at any point until adjudication (i.e., before entry of judgment). After sentencing, a trial court would be precluded from granting a diversion request.

incarceration, which often lead to better outcomes than incarceration, including reduced rearrest rates, better economic outcomes, and reduced racial disparities"].)

The majority asserts that "[i]nterpreting the word 'adjudication' to refer to a point in the process rather than a result of that process is not novel." (Maj. opn., *ante*, at p. 18.) I do not disagree. However, adjudication either refers to the legal process itself (i.e., "[t]he legal process of resolving a dispute") or the point at which the legal process is resolved (i.e., "judgment"). (Black's Law Dict. (11th ed. 2019) p. 52, col. 1.) What *is* novel is selecting *more than one* point in that process, as the majority has done, and claiming they both somehow mean "adjudication." (See maj. opn., *ante*, at p. 18 ["Our interpretation of the statute does indeed identify a discrete 'point' in the judicial process: the point at which adjudication of the charges *begins*, either when trial commences or the defendant opts to forgo trial by entering a plea of guilty or no contest, whichever occurs first"].) The two points that the majority has selected — the commencement of trial and the entry of a plea — are not only different from each other, but also conflict and are inconsistent with the point provided in the definition of "adjudication" itself — "judgment." (See *McAlpine v. Superior Court* (1989) 209 Cal.App.3d 1, 7 [explaining that, in a criminal case, the judgment is the conclusion of the legal proceeding].)

In recognizing the ambiguity of the word "adjudication," the majority excises the word "pretrial" from its context. In the majority's view, "until adjudication" must be narrowed to avoid "dissonance" between pretrial diversion requests and those that occur midtrial and posttrial. (Maj. opn., *ante*, at p. 18.) But the Legislature's choice to label, in shorthand, mental health diversion as "pretrial diversion" has a different purpose. (Cf.

*Frahs*, *supra*, 9 Cal.5th at p. 632 ["the definition of 'pretrial diversion' . . . simply reflect[s] the Legislature's intent regarding how the statute will *generally* operate when a case comes before the trial court after section 1001.36's enactment" (italics added)].) Prior to the enactment of section 1001.36, courts were unable to order mental health services until after a defendant was convicted, sentenced, and then placed on probation or sent to jail or prison. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2 [trial courts could not "order mental health treatment, relevant counselling, or adherence to a medication regime unless the person was first convicted, and then placed on probation or sent to jail at county expense"].) The Legislature enacted mental health diversion to allow rehabilitative interventions before such occurrences. Diversion requests before trial were, understandably, the ones most contemplated and anticipated by the statute since most defendants would prefer to avoid trial and, if detained pretrial, to be released from custody as early as possible. Given this backdrop, the "dissonance" identified by the majority between the literal meaning of the word "pretrial" standing alone and the statutory definition of "pretrial diversion" disappears.

In focusing on the word "pretrial" in isolation, the majority places undue emphasis on diverting defendants away from trial. Diversion from trial is one purpose of the statute to be sure. (See Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2.) However, the Legislature made clear that the overriding purpose of mental health diversion is to divert people with mental illness into treatment and rehabilitation and *away from the normal criminal process* — particularly incarceration. (Sen.

Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 3, 2018, p. 8 ["There is an urgent need for specific and targeted efforts to reduce the rates of incarceration of people with mental illness, and to facilitate successful diversion and reentry"]; Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended Mar. 9, 2022, p. 5 [" 'To avoid incarceration, individuals with serious mental illness need to be diverted from the legal system and offered rehabilitative resources' "]; *People v. Trask* (2010) 191 Cal.App.4th 387, 394 [the conventional understanding of pretrial diversion is to divert from " ' "the normal criminal process" ' "]; *People v. Superior Court* (*On Tai Ho*) (1974) 11 Cal.3d 59, 61 [diversion programs serve to divert defendants into "program[s] of treatment and rehabilitation"].)

The Legislature was focused on diverting individuals away from incarceration and into mental health treatment because incarcerating mentally ill individuals compromises public health and safety, whereas providing mental health treatment for mentally ill individuals advances it.  (See Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 3, 2018, p. 5 ["For many people suffering from mental disorders, incarceration only serves to aggravate preexisting conditions and does little to deter future lawlessness [¶] . . . [and] diversion into treatment is . . . more likely to protect public safety by reducing the likelihood that a person suffering from a mental health disorder reoffends in the future"]; see also Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended Mar. 9, 2022, p. 9 [" 'California enacted AB 1810, which authorized courts to divert people with mental health conditions . . . out of the carceral system and into treatment.  By ensuring that these

people are connected to meaningful, long-term mental health treatment instead of simply jailed and released, the diversion statute protects public safety by lowering recidivism rates . . . and leads to better outcomes for these individuals and their families"].)  Incarceration — not trial — is " 'the sea' " from which the river is intended to be diverted.  (Maj. opn., *ante*, at p. 10.)

The majority argues the Legislature, in enacting section 1001.36, has used the same definition of "pretrial diversion" that existed when section 1001.1 was enacted.  Relying largely upon dicta, the majority represents that "[a]ppellate courts long have understood section 1001.1's definition of pretrial diversion as contemplating a request for diversion before trial begins."  (Maj. opn., *ante*, at p. 10, citing *Gresher v. Anderson* (2005) 127 Cal.App.4th 88, 111–112 (*Gresher*) and *People v. Padfield* (1982) 136 Cal.App.3d 218, 227–229 & fn. 8.)[4]  "Of course, we are not bound by . . . dicta."  (*Gomez v. Superior Court* (2005) 35 Cal.4th

---

[4]  Contrary to the majority's assertion, *Gresher* did not construe section 1001.1's definition of pretrial diversion to preclude requests made after trial begins.  In *Gresher*, the court issued a writ of mandate directing the Department of Social Services to allow individuals in diversion and deferred entry of judgment programs to apply for Trustline registration.  *Gresher* rejected the Department's argument that, because individuals in diversion and deferred entry of judgment programs are awaiting trial, it could close the application process for those individuals.  It reasoned that a hearing to terminate diversion — contingent upon one's performance — was required before any trial would occur in the future, and thus, concluded "it cannot reasonably be said that persons in diversion programs are 'awaiting trial.' "  (*Gresher*, *supra*, 127 Cal.App.4th at p. 111.)  The issue in *Gresher* does not involve the construction of the definition of "pretrial diversion" and has no bearing on the issue before us today.

1125, 1155.) More significantly, the majority simply ignores that diversion consideration after the start of trial is contemplated by other "pretrial" diversion programs notwithstanding their label or the definition of pretrial diversion in section 1001.1 and at issue here. (See §§ 1001.1 [same definition of "pretrial diversion"], 1001.50, subd. (c) [same definition of "pretrial diversion"].) These statutes sanction diversion after trial begins. (See §§ 1001.2, subd. (a) [listing certain Veh. Code offenses not eligible for "pretrial diversion or *posttrial* programs" (italics added)], 1001.51, subd. (b) [listing certain Veh. Code offenses not eligible for "pretrial diversion or *posttrial* program" (italics added)].)

The majority highlights section 1001.36's placement in a section of the Penal Code labeled "Pleadings and Proceedings Before Trial" to support its interpretation. As we have observed, these headings "are not binding upon the courts." (*In re Halcomb* (1942) 21 Cal.2d 126, 130; see *In re Young* (2004) 32 Cal.4th 900, 907, fn. 4 ["article headings are unofficial and do not affect the scope, meaning, or intent of a statute"].) Section 1001.36's placement in this section of the Penal Code is practical given that diversion is typically sought prior to trial. This is no different from other diversion statutes that operate pretrial and posttrial yet also are located in the "Pleadings and Proceedings Before Trial" section of the Penal Code. (See § 1001.1 et seq.; § 1001.50 et seq.)

The other features of section 1001.36 relied upon by the majority reflect the expectation that mental health diversion "generally" will be sought prior to trial. (*Frahs, supra,* 9 Cal.5th at p. 632.) These features do not stand for the proposition that diversion consideration is foreclosed at all other points in the proceedings. For instance, section 1001.36, subdivision (c)(2)'s

9

requirement of a speedy trial waiver is only applicable when relevant.[5]  And since jeopardy can be waived, the Legislature reasonably deemed it unnecessary to include a waiver procedure in section 1001.36.  (See *People v. Batts* (2003) 30 Cal.4th 660, 679–680 [defendant may consent to a mistrial and waive jeopardy]; *People v. Overby* (2004) 124 Cal.App.4th 1237, 1243.)  Each of these statutory elements should — and easily can — be harmonized with the statutory scheme and the Legislature's purpose of diverting people with mental illness into treatment and out of the criminal justice system.[6]

---

[5]  Contrary to the majority's assertion, *Morse v. Municipal Court* (1974) 13 Cal.3d 149 (*Morse*) did not hold the speedy trial waiver requirement was dispositive of whether a diversion request must be made before trial begins.  Instead, *Morse* discussed the significance of that requirement in another diversion statute, which did not include the definition of "pretrial diversion" at issue here, the unique provisions of section 1001.36, nor its legislative history.

[6]  The diversion scheme for individuals with cognitive disabilities (§ 1001.20 et seq.) is also located in Title 6 ("Pleadings and Proceedings Before Trial").  The Attorney General acknowledges that trial courts may consider section 1001.20 diversion *after trial begins* notwithstanding that this diversion program has many of the very same features relied upon by the majority to support its conclusion that mental health diversion may only be considered before the start of trial or entry of a guilty or no contest plea.  Like section 1001.36, section 1001.20 et seq. is referred to as a "pretrial" diversion program  (§ 1001.29;  see generally  § 1001.36);  states that diversion may occur "upon an accusatory pleading at any stage of the criminal proceedings" (§ 1001.21, subd. (a); see § 1001.36, subd. (a)); requires a speedy trial waiver (§ 1001.23 subd. (a); see § 1001.36, subd. (c)(2)); provides for the dismissal of charges without reference to setting aside a plea (§ 1001.31; see § 1001.36, subd. (h)): and does not list a procedure for waiving double jeopardy (§ 1001.20 et seq.; see generally § 1001.36).

Stated plainly, the majority focuses on the wrong features of section 1001.36 while ignoring the significance of others. For example, several features of section 1001.36 — including its prima facie showing and "relevant and credible evidence" provisions — confirm the Legislature meant "until adjudication" to mean until entry of judgment.

Shortly after the enactment of the mental health diversion statute, the Legislature added a unique feature to section 1001.36, enabling trial courts "at any stage of the proceedings" to require a defendant to make a prima facie showing of eligibility and suitability for diversion. (§ 1001.36, subd. (e).) The prima facie showing provision serves as a gatekeeping mechanism for trial courts to quickly determine whether there is a need to conduct a hearing on the defendant's diversion request or to proceed with regular criminal proceedings. It defies logic that the Legislature would authorize courts to require a prima facie showing "at any stage of the proceedings" yet preclude courts from using the provision during the most widely known stage of the proceedings — i.e., "the process of resolving the criminal charges by trial." (Maj. opn., *ante*, at p. 9.)

In addition to the prima facie showing mechanism, the Legislature conditioned eligibility for mental health diversion on there being a nexus between the defendant's mental disorder and the offense. (§ 1001.36, subd. (b)(2) [providing that one of the two eligibility requirements for mental health diversion is that "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense"].) In making this finding, "[a] court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements,

11

statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense." (*Ibid.*)

The "relevant and credible evidence" provision confirms the Legislature intended trial courts to retain discretion to consider midtrial requests for diversion. While evidence developed before trial may suffice in most cases, a trial court may determine it is only capable of making an informed determination regarding this eligibility factor or the defendant's suitability for diversion for the first time during trial. Indeed, trial courts may wish to defer ruling on a diversion request to allow for consideration of evidence adduced at trial. (See, e.g., *People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887 [in denying the defendant's request for mental health diversion " 'without prejudice [for renewal],' " the trial court noted the possibility that, if " 'presented with additional evidence *at trial*, [it] could conclude that such diversion is appropriate' "].) In some circumstances, the examination of lay and expert witnesses at trial may present the earliest possible opportunity to resolve this eligibility factor. The absence of "witness testimony" in the enumerated sources is not significant, as the subdivision explicitly states the list of enumerated sources of evidence is not exhaustive. Its absence from the list of enumerated sources makes sense because trial testimony is the relevant and credible evidence that courts routinely may rely upon, whereas the enumerated sources of evidence are ones that courts might not otherwise be able to consider.

## B. *Framework of Assembly Bill 1810*

The Legislature enacted mental health diversion as part of Assembly Bill No. 1810 (2017–2018 Reg. Sess.) (Assembly Bill 1810) (Stats. 2018, ch. 34, § 24, eff. June 27, 2018) — an omnibus trailer bill. In the very same bill, the Legislature amended the mental competency scheme to incorporate a trial court's authority to consider mental health diversion for defendants found incompetent to stand trial (IST). (See State Dept. of State Hospitals, Enrolled Bill Rep. on Assem. Bill No. 1810 (2017–2018 Reg. Sess.) June 21, 2018, p. 2 [section 1001.36 "allow[s] individuals who may be found IST on felony charges and referred to a DSH [(Department of State Hospitals)] facility to also be diverted to community-based mental health treatment thus potentially reducing the number of individuals referred to DSH for treatment"].)

The Legislature was aware that an individual may be found incompetent to stand trial after a trial has started. (See § 1368, subd. (a); *People v. Rogers* (2006) 39 Cal.4th 826, 847.) Yet, for both felony and misdemeanor cases, the Legislature authorized the court to consider whether an IST defendant is an appropriate candidate for mental health diversion "pursuant to" section 1001.36 — the mental health diversion scheme. (§§ 1370, subd. (a)(1)(B)(iv) [a court may determine an IST defendant is an appropriate candidate for mental health diversion "*pursuant to* Chapter 2.8A (commencing with Section 1001.35) of Title 6" (italics added)], 1370, subd. (a)(1)(B)(v) [authorizing court to determine whether the IST defendant is eligible for mental health diversion "*pursuant to* Section 1001.36" (italics added)], 1370.01, subd. (b)(1)(A) [upon a finding of incompetency, a court must either dismiss the case or "conduct a hearing, *pursuant to* Chapter 2.8A (commencing with

Section 1001.35) of Title 6" (italics added)], 1370.01, subd. (b)(2).)

In doing so, the Legislature did not state that diversion consideration for IST defendants was "notwithstanding" any otherwise applicable deadlines for requesting diversion. This reflects the Legislature's understanding that consideration for mental health diversion is always available until entry of judgment. In Assembly Bill 1810, the Legislature contemporaneously enacted interconnected statutes (mental health diversion and amendments to the competency scheme) intended to work together. (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 632 ["we consider the language of the entire scheme and related statutes, harmonizing the terms when possible"].) The inextricable relationship between these two statutes is further evinced by the Legislature contemporaneously enacting subsequent amendments to each. (Stats. 2022, ch. 735, § 1, eff. Jan. 1, 2023; Sen. Bill No. 1223 (2021–2022 Reg. Sess.).)

The provisions of sections 1370 and 1370.01 authorize a court to grant mental health diversion to IST defendants without restoration of competency and reinstatement of criminal proceedings. Without this express authorization, mental health diversion would be unavailable to IST defendants due to the suspended nature of criminal cases while competency proceedings occur. Together, the mental health diversion and mental competency schemes provide, where relevant, express exceptions applicable to IST defendants. (See, e.g., § 1001.36, subd. (c)(2)–(3) [a speedy trial waiver and consent to diversion are not required for IST defendants because they are unable to provide such a waiver or consent due to their incompetency status].)

The majority concludes that the Legislature intended a more "flexible" timeline for mental health diversion consideration for IST defendants than for other defendants. (Maj. opn., *ante*, at p. 23.) The majority's interpretation lacks support. Nowhere in the statutory scheme nor in the legislative history is there any indication that the Legislature intended to apply a different timing requirement based on one's competency status. The Legislature intended to treat all defendants the same regardless of competency status by enacting section 1001.36 to divert all defendants who could *potentially* be found incompetent to stand trial. (State Dept. of State Hospitals, Enrolled Bill Rep. on Assem. Bill No. 1810 (2017–2018 Reg. Sess.) June 21, 2018, p. 1 [noting the need for "the development of diversion programs for individuals with serious mental disorders with the *potential* to be found or who have been found Incompetent to Stand Trial (IST)" (italics added)].) Had the Legislature meant to create an exception to any otherwise applicable timing requirement in section 1001.36, it would have said so just as it did with respect to the speedy trial waiver and consent requirements. (See § 1001.36, subd. (c)(2)–(3).) While there may be differences between competent and incompetent defendants that could justify adopting a more flexible timeline for mental health diversion in the latter group (maj. opn., *ante*, at pp. 23–24), that is not what the Legislature did here. "We cannot . . . rewrite the statute to create an exception the Legislature has not enacted." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 892.)

Notably, the majority's creation of two different timelines not only contravenes the Legislature's efforts to divert individuals who *could* be found incompetent to stand trial, but wastes judicial resources and severely compromises early

15

intervention. Under the majority's interpretation, a trial court that wishes to grant a defendant's midtrial mental health diversion request would be precluded from doing so. Yet, if a doubt is later declared as to that same defendant's competency, the trial court would be required to suspend criminal proceedings and then wait until the conclusion of competency proceedings — which can be lengthy and costly — before it could consider mental health diversion for the defendant if found incompetent. The impact of delay on IST defendants is significant and can be damaging. (See, e.g., *In re Chunn* (2022) 86 Cal.App.5th 639, 650–651 [explaining how IST defendants " 'are usually held in solitary cells or restricted conditions for at least 6 weeks after the initial declaration of doubt regarding their competency as the court awaits alienist evaluations and placement recommendations. These defendants have often clinically deteriorated even before the DSH commitment order is made and quite often . . . their troubling symptoms have increased during the period of time after the commitment order and before DSH offers them a bed. The situation is dire for these patients as they routinely face another 60–90 days without treatment after the DSH commitment is made until treatment commences.' . . . 'IST defendants have suffered and are suffering devastating injury as they are warehoused without meaningful treatment as they await DSH intervention' "].) Allowing trial courts to consider diversion in the first instance — as the Legislature intended — would potentially save untold judicial resources, as well as time during which suitable defendants could have been receiving effective treatment.

*C. The Purpose and History of Mental Health Diversion*

The Legislature enacted section 1001.36 to create a mental health diversion program to divert as many qualifying

16

mentally ill defendants out of the criminal justice system and into meaningful, effective mental health treatment. With incentives unique and distinct from probation and incarceration, the Legislature equipped trial courts with an effective tool that offers one of the best opportunities for advancing public safety and reducing recidivism. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 3, 2018, p. 4 ["Courts, as one of the first points of contact between the mentally ill and the state, can serve as a useful function in identifying defendants with mental disorders and connecting them to existing services, thereby reducing recidivism"]; Sen. Com. on Appropriations, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 9, 2018, pp. 3–4 [referencing a study that concluded " 'a mental health court can reduce recidivism and violence by people with mental disorders who are involved in the criminal justice system' "]; Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended Mar. 9, 2022, p. 5 ["Promoting treatment over incarceration has shown positive results in reducing recidivism"].)

Since the passage of Assembly Bill 1810, the Legislature has taken steps to increase the use of mental health diversion in response to concerns that it has been " 'substantially underutilized.' " (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended Mar. 9, 2022, p. 5 [" 'the mental health diversion law has been substantially underutilized due, in part, to its narrow eligibility requirements' "]; *ibid.* [" ' "LA County has only diverted a few hundred people using the law[,] [y]et an estimated 61% of people in the LA County jail system's mental health population were

found to be appropriate for release into a community-based diversion program" ' "].)**7**

The majority ignores the Legislature's demonstrated commitment to the broad application of mental health diversion. Notwithstanding the fact that approximately 94% to 97% of criminal filings are resolved by plea agreement (*Missouri v. Frye* (2012) 566 U.S. 134, 143), the majority narrowly fixates on the need to avoid costs of jury trials. However, the costs of jury trials pale in comparison to the greater costs the Legislature had in mind — namely, costs associated with incarceration and recidivism. (*Frahs*, *supra*, 9 Cal.5th at p. 635 [noting "community-based treatment for a mentally ill individual costs much *less* than jailing the same individual, and greatly reduces recidivism"].) Community-based treatment costs roughly $20,000 per year, whereas incarceration costs approximately $106,000. (See Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2; see also Sen. Com. on Public Safety, Analysis

---

**7** Senate Bill No. 1223 (2021–2022 Reg. Sess.) amended section 1001.36 by, among other things, reducing barriers to eligibility and requiring courts to consider whether eligible defendants are suitable for mental health diversion. The first eligibility factor no longer requires a court to find the defendant suffers from a mental disorder. That factor is now satisfied by a diagnosis of a mental disorder within the last five years. (§ 1001.36, subd. (b)(1).) For the second eligibility factor, the court is now required to find that the defendant's mental disorder was a significant factor in the commission of the charged offense unless there is clear and convincing evidence otherwise. (§ 1001.36, subd. (b)(2).) If these two eligibility factors are met, "the court *must* consider whether the defendant is suitable for pretrial diversion." (§ 1001.36, subd. (c), italics added.)

of Assem. Bill No. 2167 (2021–2022 Reg. Sess.) as amended May 19, 2022, p. 2 [" 'it costs about $106,000 per year to incarcerate an individual in California prisons' "].)  Considering the potential prison exposure for many defendants, the savings captured by diverting defendants into treatment can be substantial.  For example, mental health diversion for the defendant in *Frahs* could have saved the state a total of $914,000:  $86,000 annually for each year in the two-year diversion program, plus $106,000 annually for each of the remaining seven years.  (See *Frahs*, *supra*, 9 Cal.5th at p. 635 ["for an individual like defendant, who is currently serving a nine-year prison sentence, participation in a mental health diversion program rather than serving the remainder of his sentence could potentially result in substantial cost savings to the state"].)  In addition to the short-term cost savings of diverting defendants away from incarceration, the Legislature highlighted the long-term savings captured by reducing recidivism, as mental health diversion mitigates the compounding costs of future criminal proceedings and periods of incarceration.  (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan. 25, 2018, p. 5 [mental health diversion " 'will save counties money in the short-term on reduced . . . incarceration costs, and in the long-term based on reduced recidivism rates' "].)  By ignoring these short-term and long-term savings, the majority adopts a penny wise but pound foolish approach in contravention to the Legislature's aims.

The majority also misconstrues the legislative history of mental health diversion by juxtaposing pretrial diversion programs with deferred entry of judgment (DEJ).  The majority states the Legislature knew the difference between the two and

chose pretrial diversion. (Maj. opn., *ante*, at p. 39.) It is true the Legislature did not choose to enact a narrow DEJ scheme for mental health diversion, wherein a defendant is required to plead guilty. The fact that DEJ programs exist is not contrary to or in tension with the Legislature's intent to allow trial courts to grant mental health diversion up until sentencing and entry of judgment given the Legislature's desire to divert mentally ill defendants away from the carceral system.

Lastly, the majority implies its interpretation incentivizes early intervention and posits that allowing trial courts to grant diversion requests until entry of judgment "would incentivize jury trials." (Maj. opn., *ante*, at p. 40.) Certainly, I agree with the majority opinion that the earlier one can be diverted into mental health treatment, the better. However, significant incentives for early treatment are baked into mental health diversion. For one, mental health diversion " 'unquestionably' offers an ' " 'ameliorating benefit' " ' for a defendant diagnosed with a mental disorder to have the opportunity for diversion, and ultimately, a possible dismissal of the criminal charges." (*Frahs*, *supra*, 9 Cal.5th at p. 630; *id.* at p. 631 ["the procedures instituted by the enactment carry the potential of substantial reductions in punishment for the aforementioned parties"].) Additionally, for some, it may mean release from detention and otherwise avoiding a lengthy period of incarceration. (See *ibid.* ["the impact of a trial court's decision to grant diversion can spell the difference between, on the one hand, a defendant receiving specialized mental health treatment, possibly avoiding criminal prosecution altogether, and even maintaining a clean record, and on the other, a defendant serving a lengthy prison sentence"].)

In any event, I agree with Braden that, while earlier diversion consideration is better, later is still good. The majority asserts that its holding today does not limit *who* is eligible for diversion, only *when* eligible individuals must make a diversion request. (Maj. opn., *ante*, at p. 29.) But the majority's view is divorced from the reality of mental illness and intervention. A defendant seeking mental health diversion must be willing to embrace treatment. (See § 1001.36, subd. (c)(2).) This is not a decision that persons with serious mental illness may arrive at on a neat and tidy timeline. The facts of this case are illustrative of the reality that, although mental health diversion will ordinarily be requested before trial, there may be circumstances in which it is only requested later. Braden, who is diagnosed with schizophrenia, represented himself at trial. Although those who choose to represent themselves are charged with "knowing the law" (maj. opn., *ante*, at p. 32, fn. 15), those suffering from mental illness may not always appreciate or be immediately able to accept that they are in need of treatment. Once counsel was appointed, Braden promptly requested mental health diversion — yet his request was denied as untimely. Thus, as this case makes clear, requiring defendants to request mental health diversion early in the judicial process will limit *who* receives such treatment and necessarily exclude some who would benefit from the program. This is contrary to the Legislature's clear intent that courts provide appropriate alternatives to incarceration. (§ 17.2.)

## II.

Mental health diversion is a mechanism for trial courts to grant suitable defendants access to community-based mental health treatment in lieu of trial, conviction, and placement on probation or commitment to county jail or state prison. By

injecting an unnecessary timing requirement for requesting diversion consideration for defendants presumed to be mentally competent, the majority "foreclose[s] some otherwise potentially meritorious diversion claims." (Maj. opn., *ante*, at p. 30.) This is inconsistent with the Legislature's purpose in enacting mental health diversion and its recent efforts to expand its use. Divesting trial courts of the discretion to consider midtrial and posttrial diversion requests contravenes the plain language of the statute, misapprehends the statutory scheme, undermines the statute's codified purposes, and frustrates the general purpose of mental health diversion to avoid costs of incarceration and recidivism.

Today's decision will stymie the Legislature's efforts to divert suitable defendants away from incarceration and the cycles of recidivism and will contribute to the continued underutilization of mental health diversion. Allowing defendants to request and trial courts to grant mental health diversion — at any stage of the proceedings — is true to the plain language of the statute and effectuates the Legislature's purpose. The Legislature can correct today's decision by expressly clarifying that the phrase "until adjudication" in section 1001.36 means until entry of judgment.

I respectfully dissent.

**EVANS, J.**

**I Concur:**

**Liu, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Braden

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 63 Cal.App.5th 330
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S268925
**Date Filed:** June 5, 2023

---

**Court:**  Superior
**County:**  San Bernardino
**Judge:**  John M. Tomberlin

---

**Counsel:**

Cindy G. Brines and Arthur Martin, under appointments by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Steve Oetting, Assistant Attorneys General, A. Natasha Cortina, Christine Levingston Bergman and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arthur Martin
Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA 92101
(619) 696-0282

Amanda Lloyd
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9015